Docket 149/677

In the matter of the voluntary dissolution and liquidation of THE WOODLAWN BUILDING AND LOAN ASSOCIATION, JERSEY CITY, NEW JERSEY.

[Decided January 25th, 1945.]

*Mr. James E. Pyle,* for the trustees.

*Mr. August W. Heckman, pro se,* and for the objecting shareholders.

KAYS, V. C.

This matter came before me on a petition for the approval of the first report of the trustees of The Woodlawn Building and Loan Association, Jersey City, New Jersey, and also on exceptions to the report of the special master to whom the matter of the exceptions was referred.

The said Building and Loan Association is in voluntary dissolution pursuant to *R. S. 17:12–81 et seq.* Alfred G. Totten, George W. Dickson and Thaddeus A. Langan were elected trustees in 1942. They have filed their first report covering the period from October 7th, 1942, to September 30th, 1943. Exceptions were filed to the report by a group of shareholders. The special master sat for seven days in the matter and has now filed his report. The master found that the trustees did not violate their duties or exceed the powers of their office and recommended that the exceptions be dismissed. The objecting shareholders thereupon filed objections to the confirmation of the master's report.

The trustees' report was condensed and for that reason, in some particulars, indefinite. Most of the matters objected to were satisfactorily explained. There are two or three matters, however, pertaining to the conduct of the trustees which require comment and with which I am not in accord with the master's findings.

The first pertains to sales contracts which were made between the trustees and purchasers of real estate owned by the Association. These contracts provided for sales of real estate for cash to be paid by the purchaser upon the delivery of a deed and then provided that the attorney of the trustees, as the agent of the purchaser, should purchase so much of the outstanding stock of the Building and Loan Association as he might be able to procure and turn over such stock to the

Building and Loan Association as cash. The trustees then passed resolutions to the effect that the stock of the Association be accepted in payment at the "book value" of the stock and that the stock be purchased at forty-five cents on the dollar or less.

To illustrate the procedure, a piece of property was sold under contract to one Martin for the sum of $2,150. The attorney for the trustees, under the terms of the contract, was to act as the agent for the purchaser to acquire stock of the Association. The following resolution was then adopted by the trustees: "On motion it was ordered that 97 Atlantic Street, Jersey City, be sold and our stock accepted in payment at our book value, so much thereof as $2,150 (less any commission to be paid) will buy at forty-five cents on the dollar or less." The title to this property was passed on July 2d, 1943, and the amount received after adjustments was $1,885.35. This money was paid to the attorney of the trustees who deducted $2.75 for the revenue stamps placed on the deed and gave his check to the Association for $32.60 which was the excess remaining above the contract balance of $1,850 the final payment under the contract. In addition to the $1,850, the further sum of $192.50, which was the downpayment less real estate broker's commissions, was also turned over to the attorney. He, therefore, had available for the purchase of shares a total of $2,042.50. The attorney purchased shares of the Association having a face value of $4,863.09 for the sum of $2,042.50 some of which were not acquired until weeks after the deed was delivered.

In some instances, as in the above mentioned transaction, the acquisition of the exact number of outstanding shares did not equal the available cash and, therefore, fractional parts of shares were allotted to the transaction to make the cash and the shares balance. The closing statement of the sale, above referred to, shows that the whole of five certificates having a face value of $4,231.50, for which was actually paid $1,777.24, and fractional parts of two other certificates, which together had a face value of $631.67 for which $265.26 was paid, made up the transaction.

There were eight transactions similarly handled. There

were four other transactions which were not cash sales. One was an installment contract and the others were partly cash and partly secured by purchase-money mortgages. There were no provisions in these four contracts that the attorney should act as the agent of the purchaser to buy the shares. Nevertheless the proofs before the master show that the attorney did receive the cash paid on the signing of the contracts and use that money to buy shares, which shares he then turned over to the trustees for retirement.

The trustees' report, with respect to the thirteen sales above mentioned, is misleading and incorrect. The properties appeared on the books of the Association at a cost of $86,842.07. Of the amount received for these properties $51,983.08 was paid by the acquisition of shares of the Association, and only $1,720.98 received in cash. The balance was accounted for by purchase-money mortgages. This would make the loss on sales appear to be $22,988.01. Such a method of accounting is not very enlightening to a shareholder. It is objectionable because the agreed sales prices for the properties were actually only $34,400 while the report showed $62,854.06. Of the $34,400, $25,250 was paid in cash and an actual loss resulted in the amount of $52,442.07, if the bookkeeping advantage derived from the method by which the shares were taken in at their face value is eliminated.

There are two other transactions involving properties in Leonardo, New Jersey, in which the attorney acquired shares for retirement. Both of these properties in the trustees' report are shown as cancellations of delinquent mortgages and not as sales. From the evidence before the master, it appears that these mortgage cancellations may have been sales. One transaction is listed as "Sale of Leonardo property" and contains an additional notation "sale of Bd. & Mtge. McPhee to Wood. B & L Association." No contracts or agreement concerning these transactions were in evidence before the master. The trustees' report, however, make it appear that they resulted in a profit of $2,867.73. This profit appears to be merely a matter of bookkeeping which came about for the reason that outstanding shares, having a face value of $9,147.79, were acquired for $3,830.64 cash and turned over

to discharge the mortgage indebtedness amounting to $6,310.68.

In many cases the purchasers of these properties did not know or remember that the provision appointing the attorney of the trustees as their agent to acquire shares for the purchaser and to surrender them as part payment, was contained in the agreements, or, if contained in the agreement did not know the purpose thereof. The purchasers understood and treated the contracts and sales as cash transactions which, as a matter of fact, they were, since the purchasers were obligated to pay cash and not shares of the Association. None of these shares ever came into the hands of the purchasers. The attorney acquired the shares from time to time paying on an average of 43.17 cents on a dollar of their face value and, when acquired, surrendered them for cancellation at their full face value. The purchasers testified before the master that they had never seen the surrendered certificates prior to the time of the hearing. None of the forty-one certificates in evidence before the master were assigned to any purchasers of real estate. Thirty-three of them were assigned in blank and eight were assigned to the Association.

It also appears in the trustees' report that four entries noted in *"Exhibit D"* of the trustees' report are not correct. These are checks of the trustees for money received for downpayments which were paid to the attorney to enable him to purchase shares. The column explaining this schedule does not disclose that such was the purpose as the entry reads: "Refund deposit sale real estate."

The report of an accountant employed by the trustees was offered in evidence and indicated that the appraised value of a share was 58.43 cents on a dollar. This seems to agree substantially with the appraisal of the trustees which fixed the value of a share at "about fifty-six cents on the dollar."

The report of the accountant states that the purchase of shares for less than 58.43 on a dollar "means an enhancement of the value of the remaining shares and a consequent benefit to the remaining shareholders." He attempts to justify the buying of shares by the trustees in the following words: "The trustees are fully satisfied that the assets of the Associa-

tion are not being dissipated as a result of selling real estate for stock. In fact, they are confident that those shareholders who hold on to their shares will receive more in the form of dividends as a result of such stock sales."

The accountant's report also states that there was an increase in the present appraised value of the shares amounting to 6.27 cents on a dollar during the accounting period. This, his report says, was the result of the sale of real estate and mortgage loans for stock which he arrives at as follows:

| | |
|---|---:|
| Book value of shares as of September 30th, 1943 .. ........ | 54.70c |
| Dividend paid .......... ........................... | 10.00c |
| Total ........ . . .................... ...... .. | 64.70c |
| Book value of shares as of October 7th, 1942 ..... .. .. .. | 58.43c |
| Increase in value of shares ... . .. ......... ... | 6.27c |

It, therefore, appears that those shareholders who sold their shares for forty-five cents on a dollar or less may not benefit to the extent as did those who hold their shares.

The method followed by the trustees and their attorney is very unique and different from any case which has come to my attention in the conduct of liquidations. The practice might have been justified if the trustees had notified all shareholders of the appraised or book value of the shares and the price at which the shares would be purchased. Such a method would have placed all shareholders on an equal plane for the purpose of determining whether to sell their shares. Here, however, the shareholders were unaware of the method used and many of them received less than forty-five cents on the dollar.

It seems to me the transactions referred to were totally lacking in merit. The attorney for the trustees who supposedly was acting for the purchasers, was, in fact, the agent for the trustees in the acquisition of the shares.

Trustees in liquidation of a building and loan association are not directors of a corporation. Their relationship to the trust fund is governed by the law of trusts and not by the law of corporations. See *In re Locarno Building and Loan Association, 127 N. J. Eq. 509.* Trustees in liquidation are

under a duty to manage the trust estate for the equal benefit of all of the shareholders. The shareholders are the distributees, and all expenses, losses and profits are to be apportioned among them on equitable principles. See *12 C. J. S., Building and Loan Associations, § 105b.*

The above practice by the trustees resulted in a diversion of approximately $29,000 in cash receipts which should have been used for distribution among all the shareholders. The trustees' duty is to effect a liquidation within a reasonable time. It makes no difference whether the cash was used to purchase outstanding shares for the benefit of the owners of those shares or whether it was for the benefit of the owners of shares not purchased and held until final liquidation, it is still an improper preference of one class of shareholders over another. In the end it may result in a loss to the remaining shareholders or to those shareholders whose stock was purchased without the knowledge of the true worth of the Association's assets. In either case it is a speculation.

I do not intend to convey the idea that the trustees have no right to accept shares in payment of real estate sold under *R. S. 17:12–83h* but they have no right to take the proceeds of the sale of real estate, or any other cash coming into their hands by reason of the liquidation, and speculate with it by purchasing outstanding shares.

It also appears from the trustees' report that they have purchased government bonds in the amount of $15,000. The report states that the investment in government bonds was made "towards the payment of the second dividend." Here the trustees have again misconceived their duties. The statute states that they are to "wind up and liquidate the affairs of the association." *R. S. 17:12–82.* They exceeded their powers by holding back funds which should have been used to increase the dividends. They are, of course, required to create a reserve as a safety factor. It appears, however, that in addition to the $15,000 of government bonds there was a bank balance of $10,000 which was more than ample for any contingency which might occur. The shareholders are entitled to have as speedy a repayment as circumstances will permit. It is the duty of the trustees to declare and pay

dividends as and when available. If they are in doubt as to the margin of safety required, the Commissioner of Banking, I am sure, would be glad to assist them in determining the amount to be held in reserve.

I am not inclined to charge the trustees or their attorney with improper motives even though they are among the shareholders who may be benefited by the practice above referred to. I think they unintentionally misconceived their duties.

I have, however, concluded that the exceptants had reasonable cause to object to the approval of the trustees' report and that, therefore, the costs of the reference should be paid from the assets in the hands of the trustees. The transactions, above referred to, which have already been fully consummated may stand but, in the future, transactions of this nature will not be approved.